# Rush Hospital Benev. Ass'n *v.* Board of Sup'rs of Lauderdale County.

(Division B.  Jan. 8, 1940.)

[192 So. 829.  No. 33918.]

Wilbourn, Miller & Wilbourn, of Meridian, for appellant.

**J. V. Gipson** and **C. L. Denton**, both of Meridian, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

Prior to the 28th of December, 1937, Mrs. J. H. Rush owned a hospital and nurses' home, called Rush's Infirmary. Two of her sons, who were physicians, made use of the hospital in the treatment of their patients. having purchased and installed certain valuable equipment, suitable for hospital purposes. On the 28th day of December, 1937, a charter of incorporation was taken out under the name given in the style of the case, said charter, among other things, containing the following provision:

"The purpose for which it is created: Is to acquire, own and operate a general hospital in the City of Meridian, Mississippi, for the care of the sick, injured and infirm and others needing hospital care; for the treatment of diseases of the human body and may provide,

build, equip and maintain operating rooms for the purpose of performing surgical operations and may maintain and operate X-Ray machines and other machines and appliances used by the medical profession necessary to operate a modern hospital; and may organize, conduct and carry on a training school for nurses and may provide a course of study and prescribe a curriculum which, if completed and complied with may graduate said nurses and issue certificates of graduation or diplomas thereto and to this end may buy, equip and maintain real estate for the purpose of providing a home for said nurses. Provided, however, no profit or gain shall be made from the operation of said hospital and nurses' home. There shall always be maintained one or more charity wards for charity patients; and that all the income and revenue derived from the operation of said association and nurses' home be used entirely and appropriated exclusively for the maintenance and operation of the said Rush Hospital Benevolent Association and nurses' home and that none of said proceeds or receipts so had or received by said Rush Hospital Benevolent Association and/or the home for nurses be used or paid out as a profit or dividend to said stockholders.

"That all income from said Rush Hospital Benevolent Association shall be used entirely for the purpose thereof, and no part of same shall be used for profit."

After the incorporation of the hospital Mrs. J. H. Rush (Mary C. Rush) conveyed the hospital building and grounds, including the nurses' home, to the hospital, and Drs. H. Lowry Rush and Leslie V. Rush, sons of Mrs. Rush, conveyed to the hospital their equipment, etc., to be used for hospital purposes, and for a clinic, operating room, etc. Mrs. J. H. Rush and her sons, Drs. H. Lowry Rush and Leslie V. Rush, were owners of the stock of the corporation; and they became officers of the said corporation. They passed a resolution reading: "Be it resolved by the incorporators and stockholders of Rush Hospital Benevolent Association that one or

more charity wards for charity patients be established and maintained in the hospital owned and operated by the association and that all the income from said hospital, and the nurses' home constituting a part of, and operated therewith, shall be used entirely for the purposes thereof, and no part of same for profit."

Subsequently, on the 30th of December, 1937, the directors passed a similar resolution.

Drs. H. Lowry Rush and Leslie V. Rush maintained offices in the hospital for private practice, and also a clinic and operating room, used for both pay and charity patients. Two rooms were set apart for charity patients, each containing two beds, one room for the white race, and one for the colored. Patients were received and treated in the charity wards from time to time during the year 1938, varying in number, of course; sometimes when charity wards were filled with patients, other rooms were assigned to additional charity patients; and again, when the pay rooms were filled and the charity wards not in use, pay patients were placed therein. The charity patients were given the identical treatment, care, nourishment, etc., as was given to the pay patients. Other doctors brought patients to the hospital, and there treated them as in any other hospital. When any doctor recommended that a patient be received as a charity patient, such recommendation was received and acted upon by the hospital, without formal inquiry and proof as to whether or not the patient was entitled to charity. Some patients were able to pay small, but inadequate compensation for hospitalization and treatment, and were received on those terms, it being deemed better to treat such patients for an inadequate consideration than to turn them away, or force them to declare themselves charity patients.

The hospital equipment was used for both charity and pay patients. The Drs. Rush maintained their private offices and clinic in the hospital without charge to them, and part of the time used a stenographer employed by

the hospital, and the telephone installed therein. They were also paid a salary of $2,500 each out of the funds of the hospital, for their services in treating the charity patients, instructing the under-graduate nurses and training them, and for various services rendered in overseeing and managing the hospital.

In the beginning the hospital is said to have had neither money nor debts. Each of the Drs. Rush advanced $3,000 to it, without interest, to be used in its operation; which loan was repaid—without interest as stated. There were twenty-one nurses, three of whom were trained graduate nurses, the others student nurses, who were fed and lodged in the nurses' home. Mrs. J. H. Rush was given a salary of $150 per month as superintendent of nurses, and as dietitian of the hospital; and she maintained rooms in the nurses' home for her own purposes as a place to live; but no part of the nurses' home was rented to any one. There were other employees, including another physician, called a house physician, who resided in the hospital, receiving as compensation a salary of $100 per month, with room and board.

The hospital was operated for the year 1938 with a deficit of about $250. It applied to the board of supervisors for exemption from taxes, under paragraph (f) of section 3108, Code of 1930, which was brought forward in subsequent laws, being chapter 137, Laws of 1932, and chapter 157, Laws of 1934, without change except that in later acts the paragraph was numbered (g) instead of (f); otherwise it was verbatim.

On the hearing before the board of supervisors the testimony by two disinterested physicians, and by the Drs. Rush, showed without dispute that all salaries were reasonable, considering the services rendered, or to be rendered, under the employment or resolutions. The board of supervisors denied the application for exemption, and appeal was taken to the Circuit Court, where the case was tried anew, on substantially the same testimony as was given before the board of supervisors;

there was no testimony to show that the charges were not reasonable; but on the contrary the two disinterested physicians and the Drs. Rush testified that all compensation paid for services was reasonable.

The cause was submitted to the jury, but before such submission the hospital moved for a directed verdict, which motion was overruled. The jury returned a verdict in favor of the county, and thereon judgment was entered, denying the exemption applied for; from which judgment this appeal is prosecuted.

There is no dispute in the evidence as to the use of the two wards set apart for charity patients; nor is there any dispute as to the number of charity patients treated, nor that they received the same treatment given pay patients.

The legislature, in providing for the exemption for hospitals set out in the two sections referred to, intended to encourage treatment and hospitalization of those needing such assistance, but who were unable to pay for it. The financial statement of the hospital, given as an exhibit to the testimony of the witness Vann, shows as follows:

"Financial statement of Rush's Hospital Benevolent Asso. 1938.

"Income: Deposit from patients:. 44,190.08
Social Security Tax............ 86.77

44,276.85

"Expenditures:
Salaries and Wages............ 17,245.23
Groceries .................... 7,435.54
Laundry ..................... 1,426.88
Medicine and Dressings........ 706.57
Lights, Gas, Fuel, etc........... 2,554.48
Surgical & Oper. Room Exp..... 3,114.85
Insurance .................... 629.45
X-Ray & Laboratory Exp....... 1,260.78
Office and Hosp. Exp........... 5,585.36

Repair and Maintenance........    2,761.17
Miscellaneous  Exp............    1,722.71
Bad  Checks  ................       64.00
                                 ————————
                                             44,507.00
                                             ————————

Deficit  ...........................     230.15''

We think this case is controlled by the decisions of the Court in preceding cases; see Board of Supervisors, Warren County, v. Vicksburg Hospital, 173 Miss. 805, 163 So. 382; Board of Supervisors of Hinds County v. Jackson Hospital Benevolent Ass'n, 180 Miss. 129, 177 So. 27.

There is in the record no proof to show that the hospital did not fully comply with the law in assigning the rooms for charity patients; nor is there any proof that they were not properly and adequately treated. On the contrary, the undisputed proof is to the effect that they did receive such treatment and care.

What may be suitable compensation for services rendered by the hospital is primarily for the decision of the corporation; and if it is within the limits, as to which reasonable men might differ reasonably, the judgment of the hospital authorities should not be overturned; but should it be manifest that compensation for services was unreasonable, and the proof sustain that theory, then the judgment of the hospital authorities would not be controlling, but only persuasive. It is, of course, desirable that a hospital should be equipped, not only with instruments, medicines, nurses, but also with those qualified to provide the necessary skill and management in the treatment of patients therein. A hospital may, of course, employ a physician to treat the charity patients, should it be necessary, or be deemed appropriate. It certainly was within the contemplation of the legislature that such patients should receive proper attention and treatment.

Giving every consideration to the judgment of the jury, we are constrained to hold, as to charges and expenses connected with the management of the hospital, as shown by the proof in this record, that they were reasonable, and that the jury were in error in reaching a contrary conclusion. We think that the hospital comes within the requirements set forth in the act, and that it was entitled to the exemption. The public, in our judgment, received a benefit equivalent to the exemption from taxation.

The judgment will be reversed, and judgment rendered here for the appellant hospital.

Reversed and rendered.