[No. 28167. Department Two. June 26, 1941.]

VIRGINIA MASON HOSPITAL ASSOCIATION, *Appellant,* v.
ANNA AUGUSTA LARSON et al., *Respondents.*[1]

[1]Reported in 114 P. (2d) 976.

*Poe, Falknor, Emory & Howe,* for appellant.

*Tom W. Holman, Harold A. Pebbles,* and *Stevenson & Gershon,* for respondents Larson *et al.*

*The Attorney General* and *Lyle L. Iversen, Assistant,* for respondent Bates.

*Lewis L. Stedman, J. L. Corrigan, O. D. Anderson, Jones & Bronson,* and *Hayden, Metzger & Blair, amici curiae.*

JEFFERS, J.—This proceeding was started by the claimants, Anna Larson and Emory Gustafson, respondents herein, to recover unemployment benefits, as provided for by the unemployment compensation act (Laws of 1937, chapter 162, p. 574, as amended by Laws of 1939, chapter 214, p. 818; Rem. Rev. Stat.

(Sup.), § 9998-102 [P. C. § 6233-302] *et seq.*). Both claimants had been employed by the Virginia Mason Hospital Association, appellant herein, had voluntarily ceased their work for the association, and had subsequently applied for benefits from the unemployment compensation fund. It is not claimed that claimants are not entitled to the benefits sought, if the Virginia Mason Hospital Association is an "employer," as that term is defined in the act. The only question, therefore, presented on this appeal is whether the association is an "employer" under the act.

Rem. Rev. Stat. (Sup.), § 9998-104 [P. C. § 6233-304] (e), provides that:

"For the purpose of this section wages shall be counted for benefit purposes with respect to any benefit year only if such benefit year begins subsequent to the date on which the employer from whom such wages were earned has satisfied the conditions of section 8 (c) or section 19 (f) with respect to becoming an employer." Laws of 1937, chapter 162, p. 578, § 4, as amended by Laws of 1939, chapter 214, p. 821, § 2.

The pertinent portion of Laws of 1937, chapter 162, p. 609, § 19 (f) (1) (Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (f) (1)), referred to above, defines "employer" as

"Any employing unit which in each of twenty different weeks within either the current or the preceding calendar year (whether or not such weeks are or were consecutive) has or had in employment eight or more individuals (not necessarily simultaneously and irrespective of whether the same individuals are or were employed in each such week)."

Laws of 1937, chapter 162, p. 612, § 19 (g) (6) (v) (Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (g) (6) (v)) provides that the term "employment" shall not include

"Service performed in the employ of a corporation, community chest, fund, or foundation, organized and

operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, *no part of the net earnings of which inures to the benefit of any private shareholder or individual.*" (Italics ours.)

If the Virginia Mason Hospital Association (hereinafter referred to as the association or appellant) brings itself within the exemption of Rem. Rev. Stat. (Sup.), § 9998-119 (g) (6) (v), then it is not an "employer," as that term is defined in § 19 (f) (1), *supra;* and, as provided in § 9998-104 (e), *supra,* the wages earned by respondents in the service of appellant cannot be counted for benefit purposes.

According to its articles of incorporation, appellant was incorporated June 26, 1934, under the provisions of Rem. Rev. Stat., § 3863 *et seq.,* relating to educational, religious, social, and charitable corporations and associations. No capital stock nor shares of stock were issued, and none is to be issued. The original incorporators constituted the members of the corporation, and they and their successors became a body politic and corporate with perpetual succession, vacancies in membership to be filled by election by vote of a majority of the acting members. Appellant is managed by a board of trustees, which may not be less than eight nor more than fifteen, each of whom must be a member of the corporation. The first board of trustees consisted of the eight original members.

The expressed objects for which appellant was formed were to *found, construct, maintain, and operate a hospital in the city of Seattle, for medical and surgical treatment and nursing of the sick and infirm.* It was the purpose of the trustees to make the hospital self-sustaining, with the privilege of furnishing needy persons with gratuitous service at the hospital, and generally to provide for charitable help to such persons where the same might be necessary and proper, ac-

cording to the best judgment and discretion of the trustees.

*Profits, income,* and *contributions* were to become and remain the *sole property of the corporation,* with no right, title, or interest in the same in any member, officer, or contributor, and the same were to be applied to the *support and maintenance* and *enlargement* of the hospital and its *facilities,* after payment of expenses. Auxiliary facilities were to be maintained in connection with the hospital, including training school for nurses, a nurses' home, boarding and rooming establishments, and such other facilities as are ordinarily employed in the maintenance of regular hospitals.

Prior to June 30, 1934, a private profit corporation, organized in 1919 as the Virginia Mason Hospital, Inc., had owned and managed the hospital premises and facilities which were acquired by appellant. The incorporators of the Virginia Mason Hospital Association, who became the members, trustees, and officers of appellant, were persons who had held the controlling stock interest in the Virginia Mason Hospital, Inc. (there being about forty such stockholders), and were members of the board of directors of the former corporation.

On June 30, 1934, appellant purchased all of the assets and assumed all of the liabilities of the former corporation. The agreed purchase price was to be the net worth of the assets, as disclosed by the seller's books on June 1, 1934. This net worth was determined to be $132,218.44, which appeared on the books as $120,000 par value fully paid up capital stock, and $12,218.44 undistributed surplus. Appellant paid for these assets by issuing bonds in the amount of $132,200, secured by a second mortgage, in the form of a trust deed, upon the assets. These bonds bear interest at

the rate of eight per cent from and after January 1, 1936, payable semi-annually, and are to be retired at the rate of $2,500 per year, beginning in 1945. They were distributed to the shareholders of the selling corporation in accordance with their respective stock interests.

The Mason Clinic, a copartnership for profit, composed of practicing physicians and surgeons, occupies the ground floor of the hospital building as a month-to-month tenant. Of the thirteen members of the clinic, seven are at present trustees of appellant, and at all times, all or nearly all of appellant's trustees have been members of the clinic. The clinic owns everything on the clinic floor in the nature of equipment, furniture, medical apparatus and appliances. The books of the clinic have always been kept separate and distinct from those for the hospital. Other facts which are material to the decision appear in the opinion.

Each claimant individually filed with the unemployment compensation division an initial claim for benefits, alleging total unemployment, and stating that their last employer was appellant. The initial determination of these claims, as provided for by Rem. Rev. Stat. (Sup.) § 9998-106 [P. C. § 6233-306] (b) (Laws of 1937, chapter 162, p. 582, § 6, as amended by Laws of 1939, chapter 214, p. 825, § 4), resulted in their rejection, on the ground that there was "no wage record" on file for the claimants. Respondent Anna Larson requested a reexamination of this initial determination, which was returned with the notation that appellant had claimed exemption on the ground that it was operated for a charitable purpose, and no part of its net earnings inured to the benefit of any private individual or shareholder. From this initial determination, respondent Emory Gustafson duly appealed to the appeal tribunal, as provided in Rem. Rev. Stat. (Sup.), § 9998-106 [P.

C. § 6233-306] (b), (c), and (d), and respondent Anna Larson likewise appealed from the reexamination, each alleging that appellant was not a charitable organization. With the hospital made a party to the record, the two appeals were consolidated for hearing before the appeal tribunal and were heard on oral testimony before an appeal examiner designated by the unemployment compensation commissioner.

The appeal examiner made findings of fact, conclusions of law, and decision, in which he reversed the unemployment compensation division, finding and holding that the hospital was not organized and operated exclusively for charitable purposes; that its earnings did inure to the benefit of private individuals; and that claimants, in rendering service to the hospital, were in "employment" subject to contributions for unemployment compensation. The appeal examiner ordered the unemployment compensation division to treat the hospital as a subject employer, and to pay the benefits determined to be due the claimants. A petition to review this decision was duly filed by the hospital with the commissioner of unemployment compensation and placement, in accordance with Rem. Rev. Stat. (Sup.), § 9998-106 [P. C. § 6233-306] (e). The commissioner, on the record made before the appeal tribunal, affirmed the decision of the appeal examiner.

An appeal from the commissioner's order was duly taken by appellant, as provided by Rem. Rev. Stat. (Sup.), § 9998-106 [P. C. § 6233-306] (h) and (i), to the superior court for King county, where the case was heard solely on the commissioner's record. The trial court affirmed the action of the commissioner in refusing to reverse and set aside the findings and decision of the examiner; and from this decision of the trial court, the hospital appeals to this court.

Claimants' rights to unemployment benefits, in the

final analysis, turn upon whether services performed for appellant are services performed in "employment," as that term is defined in the unemployment compensation act. Appellant contends that the claimants' services were not in "employment." This contention is based upon Rem. Rev. Stat. (Sup.), § 9998-119 (g) (6) (v), hereinbefore quoted. In the words of this section, appellant contends that it is a "corporation . . . organized and operated exclusively for . . . charitable . . . purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual." If appellant is, in fact, so organized and operated, then respondent claimants are not entitled to benefit payments.

Respondents do not deny that appellant was organized and has been operated exclusively as a hospital, but they contend that in this case this is not exclusively a charitable purpose, because an insufficient percentage of appellant's income has been devoted to the rendition of gratuitous services to patients. Assuming, without deciding, that, to be entitled to the exemption claimed, appellant must render to the public a certain amount of free service, we are of the opinion that the record sustains appellant's contention that a sufficient amount of such gratuitous service has been rendered, in the form of free hospitalization to some charity patients, the care and treatment of adult and infant diabetics, the care and treatment of children from the Washington Children's Home, and the acceptance and treatment of emergency cases. It does not appear that appellant has ever refused to admit any patient on account of race, creed, or financial condition.

It has long been the rule in this state that the exaction of compensation for services rendered does not, of itself, deprive an institution of its charitable status. *Tribble v. Missionary Sisters of the Sacred*

*Heart,* 137 Wash. 326, 242 Pac. 372; *Miller v. Mohr,* 198 Wash. 619, 89 P. (2d) 807.

The controlling question in this case is whether appellant is so organized and operated that any part of its net earnings inures to the benefit of any private individual.

We are of the opinion that, for the purposes of the unemployment compensation statute, the phrase "net earnings" should not be given a strictly literal construction, as in the accountant's sense. We believe that the policy underlying this exemption should not be nullified by judicially sanctioning an accounting subterfuge which permits secretly siphoning profits from the purported charitable institution into the pockets of private individuals. The substance should control the form, and if, in fact, the net earnings of such a corporation inure to the benefit of private individuals, then, irrespective of the means by which that result is accomplished, the institution should be denied the exemption granted to charitable corporations under this act, and employees serving the institution should be entitled to the benefits of the act.

The arguments of counsel and the findings of fact and conclusions of law made by the appeal examiner and the trial court present two theories which respondents advance to prove that part of the net earnings inures to the benefit of private individuals: First, that the payment of interest and principal to the holders of the second mortgage bonds is a device whereby such bondholders secure to their private gain a part of the net earnings; and second, that this result is also accomplished through the interrelation of the personnel and activities of the trustees and association on the one hand, and the bondholders and clinic on the other hand.

Before considering the question concerning the

reasonableness of the interest rate on the bonds and the valuation placed on the property transferred for the bonds, we desire to make a general observation. Ordinarily, a charitable association has power to acquire property by purchase, and to pay for the property so acquired, without loss of its charitable status. Assuming that the purchase was made from a stranger who stood in no position of control in relation to the association, if the value of the property is not less than the purchase price, then it would seem that, even if the purchase price were paid out of the net earnings of the association, it could not be said that the net earnings inured to the benefit of the vendor in the sense intended by § 19 (g) (6) (v), *supra,* and this would be true even though the vendor had reaped a legitimate profit from the transaction.

To hold otherwise, would make it virtually impossible for a charitable association to acquire the property necessary to the carrying out of its charitable purposes, except through donations, without a resultant loss of its charitable status; and the statutory exemption would amount to only idle words which grant the exemption with one hand while destroying the prerequisite status with the other.

We see no reason why the result should be different when the sale is made by a vendor who is also in a position of control of the charitable association. Again we assume, of course, that the association has received full value for the money paid out or obligation incurred, and that the vendor has taken no unfair advantage of the association. Payment of the purchase price to the vendor, from whatever source the funds are secured, is not an inurement of the "net earnings" to the "benefit" of individuals, in the statutory sense of these terms.

That the purchase price should be evidenced

by bonds and its payment postponed to a future date, cannot cause the interest and principal paid under these bond contracts to be an inurement of the net earnings to the benefit of private individuals, any more than it would be had the purchase price been paid in cash or postponed on open account. If there existed the right to incur the debt, there also must exist the right and the duty to liquidate it. *Miller v. Mohr*, 198 Wash. 619, 89 P. (2d) 807; *Commissioner of Internal Revenue v. Kensico Cemetery*, 96 F. (2d) 594 (C. C. A. 2d, 1938); *Board of Supervisors v. Jackson Hospital Benevolent Ass'n*, 180 Miss. 129, 177 So. 27. In so far as *Hamilton v. Corvallis General Hospital Ass'n*, 146 Ore. 168, 30 P. (2d) 9, a case much relied upon by respondents, announces a contrary doctrine, we must decline to follow it. The rights and obligations between the association and the bondholders were determined by and at the time of the original agreement, and are in no sense dependent upon net earnings. It would, in our opinion, be altogether improper to construe this exemption provision so that payment to *bona fide* creditors constitutes them shareholders to whose benefit the net earnings inure.

▮ Respondents contend that the interest of the shareholders in the Virginia Mason Hospital, Inc., was practically worthless in 1934, when the sale was made to the present corporation, and that, by this transfer and reorganization, for their almost hopeless insecurity, there was substituted a very favorable financial position in which, as secured creditors, they obtained greater assurance of the eventual return of their capital investment, plus periodic payments of interest. It is contended that this return of capital was extremely doubtful under the former corporate organization, and that the payment of interest on the bonds is, in actuality, only a substitute for the payment of

dividends on stock—dividends which the former shareholders had hoped for, but had not received from the private profit corporation.

We are inclined to the view that if, in fact, the equity of the Virginia Mason Hospital, Inc., was artificially inflated, for the purpose of the sale, and bonds were issued on the basis of this false value, at a rate of interest otherwise proper, or if the interest was at an excessive rate, then respondents' contention is sustainable. In substance, these would amount to devices whereby the net earnings of the association would inure to the benefit of private individuals, the bondholders.

The appeal examiner made no finding of fact or conclusion of law concerning the value of the equity of the Virginia Mason Hospital, Inc. The trial judge made no findings of fact, but in his discussion with counsel concerning the reasons for his decision, he expressly said that he thought the full value was paid by the association, but "wouldn't say that it was any more than that."

Mr. Lewis A. Dare, who has been business manager at all times, first of the original corporation from the time it came into existence in 1919, and then for the association since 1934, testified that the price paid by appellant for the assets of the old corporation represented the rock bottom depreciated value at that time, and was a fair and reasonable price.

Mr. Harry Baldwin, manager of the loan department and vice-president of the Washington Mutual Savings Bank, who for the last ten years has devoted the greater part of his time to making loans upon the security of improved real estate, and who was personally familiar with the properties owned by the Virginia Mason Hospital, Inc., his bank having lent more than $120,000 on the security of its fixed assets,

testified that the reasonable value of this property, in July, 1934, would have been about $350,000. This figure exceeds by some $12,000 the price at which the fixed assets were sold to appellant.

There is no other direct testimony in the record concerning this question of value, nor is there, in our opinion, any circumstantial evidence which would support a conclusion that the sale price of the corporate assets or the shareholders' equity therein was padded.

Dr. George A. Dowling, secretary of the association, and formerly secretary of the selling corporation, testified that the corporate shareholders had from time to time advanced money to the corporation, and that, except for two years during the 1920's, profits were not forthcoming. From this testimony, respondents conclude that the shareholders' interest in the corporation had little or no value at the time of the sale in 1934. Had the appeal examiner made such a finding of fact, it may be that such a finding would have had to stand on this appeal as a correct deduction from Dr. Dowling's testimony, on the theory that value should be determined by earnings, rather than by cost less depreciation. But no such finding was made by the appeal examiner.

Examining this as an original question of fact, we do not believe Dr. Dowling's testimony, even if true, overcomes the direct evidence that the valuation was proper. The record is very incomplete as to the earnings of the original corporation from 1920 to 1934, but it does appear that, during this period, income taxes were paid for at least two years of operation; indebtedness and interest expenses were increased by the addition of a new hospital wing; assets were materially increased; and approximately $175,000 of capital indebtedness was retired. The record contains no information concerning the amounts of corporate net in-

come exempt from Federal income taxation during the years from 1920 to 1934, nor concerning the rate of depreciation applied to the corporate assets, nor as to the annual allocation of gross income to new asset acquisition.

In view of the fact that no finding was made by the appeal examiner on the question of value of the assets of the original corporation, and in view of the direct testimony as to the value of these assets, we are of the opinion that the evidence preponderates against the conclusion that the shareholders' interest was inflated for the purpose of sale, and we are further of the opinion that the price paid for these assets was reasonable and fair.

Even though the assets were correctly valued, we are of the opinion that, if the interest rate applicable to the bonds issued was exorbitant, this excessive interest would effect, in reality, a distribution of the net earnings to the bondholders. It is contended by respondents that such is the case, and the appeal examiner at least implied this conclusion when he stated:

"Considering the interest rate of 8% for long term bonds, and the continued exclusive right of control and management vested in the bondholders, as trustees, it must be concluded that the 'organization' contemplated and provided for definite part of the net earnings of the corporation to inure to the benefit of the members as individuals."

If by this finding the appeal examiner meant to find that eight per cent was an excessive rate, the finding must be set aside as arbitrary and capricious, for the reason that in our opinion it is totally unsupported by any evidence whatsoever in the record. Four witnesses testified positively that eight per cent was a reasonable rate of interest, consideration being given to the date of the transaction, the value of the security, the amount

of the first mortgage, and the risk inherent in the second mortgage security. These witnesses were Mr. Baldwin, Mr. Burton Gottstein, who for twelve years had been actively engaged in underwriting Seattle business property for Blyth & Company, Mr. Dare, and Dr. Dowling. There was no testimony to the effect that the interest rate was excessive.

Respondents' argument that the interest rate was excessive is based upon the facts appearing from the testimony that fresh money was not advanced by the bondholders and would not have been available in 1934 on the security of this second mortgage, and that the property was valuable for the limited purpose of hospital use only.

It seems to be implied by respondents' argument that eight per cent would have been a reasonable rate to have paid for fresh money secured only by a second mortgage, if fresh money in fact had been put up in 1934. This distinction seems to us to be without merit. In either event, the vendee or the borrower owes an obligation which is fixed in terms of money. In other words, reserving the question of the identity of the bondholders and trustees, the question of reasonableness of the interest rate is exactly the same as if some individual had advanced to the association cash with which the association had purchased these assets, and had secured the lender with a second mortgage on the assets, promising to pay eight per cent for the use of the money. Granting that the property was valuable only for the limited purpose of using it for a hospital, this fact only serves to emphasize the reasonableness of the interest rate, because it reduces the value of the security, should a mortgage foreclosure sale become necessary. However, this limitation of purpose does not make the property any the less valuable to the association or to the selling corporation, as argued by

respondents. Its value exists so long as it is being put to its primary use as a hospital. It has been consistently so employed, and, so far as the record shows, there is no present intention to ever devote it to any other purpose.

Our conclusion as to the first of respondents' two theories is that the payment of principal and interest to the holders of the second mortgage bonds is not a device by which the net earnings of the association inure to the benefit of private individuals, so as to deprive appellant of its exemption under the statute.

In support of this conclusion, and as bearing upon the good faith of the organizers of appellant and the absence of their intent to profit by substituting interest on bonds for dividends on stock, it should be observed that, in actual operation, the organizers of appellant have, in effect, canceled most, if not all, of the bond interest payments to which they were entitled up to this time. Their conduct completely negates any claim that they have perpetuated their rights to profits by means of these second mortgage bonds. The controlling group held some $100,000 of the second mortgage bond issue of $132,000. The annual interest received by this group since 1936 is about $8,000. This same group waived the trustees' annual salary of $5,000, which they had formerly received for the same administrative services from the Virginia Mason Hospital, Inc. They made an annual cash gift to the hospital of $2,400 to pay the hospital's share of the manager's salary, and they paid an annual rental increase for the clinic space of $2,400. The rent was increased according to an independent appraisal, and therefore cannot be treated as a gift, because the clinic receives full value. But the other two items, totalling $7,400 annually, are a direct financial detriment, voluntarily incurred by the

controlling group when appellant was brought into being.

Considering the $8,000 annual interest income in relation to the $7,400 voluntarily assumed annual detriment, it is difficult to see how bad faith can be imputed to this controlling group because of the part they played in organizing appellant. Nor do we think this conduct can be squared with the contention that payment of the annual bond interest actually perpetuates payment of dividends to the former owner. From the standpoint of the hospital, the net actual expense for the use of this $100,000 has been only about $600 per annum.

Concerning the second of respondents' theories, the appeal examiner concluded, as to the interrelation of personnel and activities, that

"It is our further opinion that the joint operation of the clinic and association facilities, interlocking of management and individual interests as partners and trustees, exchange of personnel and the integration of the services provided by each, show the corporation to be so operated that part of the net earnings do inure to the benefit of private individuals."

Nothing in the record which we have been able to discover discloses how any of these enumerated features in fact causes the association to have been so operated that any part of its net earnings inure to the benefit of members of the clinic, the trustees, or any other private individual. It is, of course, perfectly possible that a purported charitable association may be so operated in conjunction with a private profit venture that the net earnings of the former are in effect drawn off into the coffers of the latter, but proof of that result must rest on something more tangible than the suspicion aroused by a showing of close business affiliation. By his reference to joint operation of the clinic and association facilities, the appeal examiner ap-

parently had in mind the clinic's tenancy of the ground floor of the hospital building, the maintenance by the clinic of laboratory and X-ray facilities, which were available for hospital use, and the interchange of certain therapy apparatus and other equipment.

The evidence shows, as the trial judge said, that the association and clinic "have meticulously kept their affairs separate." All use made of equipment and space belonging to the other is promptly paid for upon a schedule of charges, which appear to be fair and reasonable, and which are not claimed to be otherwise.

We are unable to see how an arrangement by which essential services are supplied to the hospital at a reasonable cost, and under which a reasonable rental value is paid to the hospital for the use of its property, can be said to be an allocation of the net earnings of the hospital to the benefit of private individuals.

The "exchange of personnel" has reference to the use made by the clinic of nurses and internes. The evidence shows that student nurses taking their training in the hospital each serve two months in the clinic, and nothing is paid to the association for these services, the association providing all expenses incident to nurses' training. But the evidence also shows, without dispute, that these services are of no benefit to the clinic, because the girls, having had no previous laboratory or X-ray experience, serve with each department in the clinic only for a training period during which they are taught the rudiments of that particular work. Their services cease when they reach the point at which they would be of some value to the clinic.

As to the internes, the appeal examiner made a finding that their services "are utilized by the clinic without charge." However, the testimony on this matter establishes without contradiction that the clinic pays all of the interne's salary for the three months he

serves partially in the clinic. The hospital continues to furnish the interne with board and room, because the interne continues on duty in the hospital during these three months, dividing his time between the clinic and the hospital. The only testimony on this question is to the effect that this arrangement is a fair division in accordance with the amount of time the interne puts in at the hospital and the clinic.

We are of the opinion the evidence compels the conclusion that the clinic has consistently fully reimbursed the association for any benefit gained from services performed by nurses or internes employed by the association. There is absolutely nothing in the record to support a contrary conclusion.

Concerning the "integration of services provided by each," the appeal examiner, in so far as we are able to determine, apparently had in mind his finding that "the clinic maintains and operates several services normally conducted in connection with a hospital, including X-ray and laboratory facilities," and also his finding and conclusion that the clinic and hospital are "supervised by a joint business manager," and that the clinic "trains student nurses and internes as a part of hospital training, and derives an income and profit from hospital patients."

In so far as there is an integration of the services provided by each, this occurs only to the extent that each renders services complementary to the other. There is nothing in this record to show that laboratory and X-ray facilities are normally conducted in connection with a hospital, but even if this were true, it would not follow that the hospital must own such equipment. In so far as the record discloses, the practical situation in this case, where the clinic is well equipped with these facilities and in the same building, would make it hardly a feasible economy for the hospital to

acquire expensive duplicate equipment. This is especially true where the business practice of the clinic is to charge the hospital reasonable rates for the services performed, and the hospital in turn charges the patient a sufficiently high rate to leave for itself a very respectable margin of profit. There is no reason that we can see why the association must own all the facilities used in connection with the hospital; and since it is not shown that the clinic has taken any advantage whatsoever of the hospital in supplying essential complementary facilities, this arrangement, in our opinion, cannot be said to facilitate the clinic's reaching the association's net earnings. There is nothing in this record which even intimates that up to the present time it has had this result.

Nor do we see how, from this record, respondents can claim their theory is in any manner sustained by the joint employment of a manager. This would appear to be only sound business economy. Each contributes ratably to his salary, and there is absolutely nothing to indicate that the association has been managed so as to foster the interests of the clinic at the expense of the association.

As to the income and profit derived by the clinic from the patients in the hospital, it is not shown that this could possibly have any adverse effect upon the net earnings of the association. In the first place, the majority of the patients in the hospital are patients of the clinic before being placed in the hospital; and, in the second place, the patient's choice of a doctor and his payment for such services can be absolutely no financial concern of the association. This is a matter strictly between the patient and his doctor, and certainly does not deprive the hospital either of income or of net earnings, any more than do fees paid by the patients to visiting doctors. It is not shown that, in

making collections, the clinic is given any preference to the hospital, where the funds are insufficient to pay both bills.

The record sustains the appeal examiner's conclusion that there is an "interlocking of management and individual interests as partners and trustees," but only in the sense that the trustees of the association also constitute a majority of the clinic partnership. This may be considered as a suspicious circumstance, and if there were any evidence whatsoever that the association was being so conducted that any part of its net earnings did, in substance, inure to the benefit of the clinic, that evidence would not be lightly dismissed. But the record is completely devoid of any evidence of this character, and is replete with evidence that each organization has been operated separately and strictly in its own interest (in addition to prior matter concerning X-ray and laboratory facilities, and nurses and internes).

Appellant's explanation of this dual role played by the trustees is, in our opinion, entirely satisfactory. The trustees of the association were the persons who had previously run the Virginia Mason Hospital, Inc., and were well qualified by experience to run the association when it took over the operation of the same properties. Their services are gratuitous. In addition to their experience, it is of definite benefit to the hospital that the executive board be always readily available for immediate consultation by the managers and supervisors.

We are of the opinion that the record does not sustain the appeal examiner's conclusion that the "joint operation," "interlocking of management," "exchange of personnel," and "integration of services," show the corporation to be so operated that part of the net earnings inure to the benefit of private individuals.

Where a clinic is operated for private profit in conjunction with a purported charitable hospital, in such a manner that the hospital receives full consideration from the clinic for the goods and services with which the hospital supplies the clinic, and where the hospital pays the clinic only reasonable and usual prices for the services supplied by the latter, the hospital cannot be treated as an institution operated for the private profit of the clinic. *Board of Supervisors v. Vicksburg Hospital,* 173 Miss. 805, 163 So. 382; *Rush Hospital Benevolent Ass'n v. Board of Supervisors,* 187 Miss. 204, 192 So. 829. Certainly, the net earnings of such a hospital do not inure to the benefit of the clinic.

In all probability, the clinic does gain certain incidental benefits from this arrangement, but it does not appear how any incidental benefits which may be gained by the clinic from its business association with appellant can in any way adversely affect the net earnings of the latter, so that it could be said to cause such net earnings to inure to the benefit of the clinic.

The appeal examiner also concluded that "separate entities [as to the clinic and the association] are not found as each is dependent on the other for efficient operation." We do not believe that lack of independence from other organizations is the test of whether an institution is a separate entity. Every institution is in a measure dependent upon the functioning of other institutions which provide goods and services necessary for the efficient operation of the former. But each may be nevertheless a completely separate entity. If the control of each of these institutions were in separate hands, it would be clearly evident that the mere interdependence for goods and services would not merge the identity of these organizations. Since the record shows that each has been controlled and managed solely in and for its own in-

terests, and since each is organized as an entirely separate entity, we find no basis for sustaining the conclusion that they are not in fact separate entities.

Because of the conclusions reached by us herein, it becomes unnecessary to pass upon appellant's further assignments of error. We therefore express no opinion upon appellant's claims of right to introduce before the trial court evidence *de hors* the commissioner's record, or to have the cause referred back to the examiner for the taking of further testimony.

 In order that there be no misconstruction placed upon the judicial process employed in this case, we feel that attention should be called to the fact that nothing said or done herein does, or is intended to, intrench in any way upon the rule announced in *In re St. Paul & Tacoma Lumber Co.*, 7 Wn. (2d) 580, 110 P. (2d) 877, with reference to the unemployment compensation act, that

" . . . the administrative determination of the facts is conclusive on the court unless it be wholly without evidential support or wholly dependent upon a question of law, or clearly arbitrary or capricious."

This rule does not bind the court to the administrative findings of fact in the sense that the court cannot look to the commissioner's record to determine whether the findings of fact are arbitrary and capricious, wholly dependent upon a question of law, or wholly without evidential support. Nor is the court precluded from looking to the commissioner's record for the purpose of, in effect, making additional material findings of fact, where the administrative findings are incomplete, and where such additional findings do not controvert those conclusive findings of fact made by the administrative agency. Were the rule otherwise, then, by making only partial and biased findings of fact, the administrative tribunal could compel the court to sus-

tain the administrative conclusions and decision, regardless of the character of the evidence in the record to the contrary. The administrative agency cannot thus foist upon the court its conclusions of law. It is for these purposes alone that we have carefully reviewed the whole record brought up in this case. With certain exceptions heretofore referred to, where the evidence wholly failed to support the administrative findings, we have adopted, as the factual basis of our conclusions, all of the administrative findings of fact made by the appeal examiner.

In addition, we have, in effect, made certain original findings of fact, which are uncontroverted by the testimony or by the facts found by the appeal examiner, and which are necessary and material to a complete disclosure of appellant's character of organization and methods of operation.

Our conclusion that none of the net earnings of appellant inure to the benefit of any private individual is a conclusion judicially impelled from a full consideration of all of these facts, which, when taken together, refute the conclusion reached by the administrative tribunal.

We conclude that appellant is exempted by § 19 (g) (6) (v), *supra,* from the operation of the unemployment compensation act, and that claimants are therefore not entitled to the unemployment benefits allowed by the trial court.

The judgment appealed from is reversed, and the causes remanded with directions to the trial court to enter a decree in conformity with this decision.

ROBINSON, C. J., BEALS, SIMPSON, and DRIVER, JJ., concur.